IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

FILED
NOV 0 5 2019
Clerk, U.S. District Court
District Of Montana
Missoula

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>SETH WILLIAM DANIEL,<br><br>Defendant. | CR 19–102–BLG–DLC<br><br>ORDER |

Before the Court is Defendant Seth William Daniel's Motion to Suppress Evidence. (Doc. 23.) Daniel stands charged with one count of prohibited person in possession of a firearm in violation of 18 U.S.C. § 922(g)(8). He seeks suppression of evidence on the basis of an alleged illegal entry into his home, during which time law enforcement officers viewed him carrying an AR-15 assault rifle. An evidentiary hearing was held on October 29, 2019. Having considered the testimony at the hearing, an audio recording of the relevant interaction, and the police reports and other exhibits submitted by the parties, the Court denies the motion.

## Background[1]

Shortly before dusk on June 30, 2019, Billings City Police Officers Jayden Romero and Travis Fjetland responded to a complaint of a disturbance in a South Side neighborhood. (Doc. 28-1.) When they exited their vehicle, they could hear a man shouting from inside a house. Approaching the house, they saw children in a car parked outside the residence and Daniel, inside and visible through the open doorway, screaming at a woman. As the officers neared the door, the woman—Daniel's girlfriend, Xena—left the house.

Officer Fjetland spoke with Xena very briefly as she moved into the yard. She told them that Daniel was inside the house along with his father, Sam, and that Daniel was not doing well. Xena stepped down the stairs from the entryway, the door open behind her. Officer Fjetland called to Sam, who was visible from the entryway, and asked to speak with Daniel.

Daniel began to direct his attention and anger toward the officers. Officer Romero's personal microphone captured the audio of the exchange. Daniel unleashed a stream of invectives toward the officers, which was echoed at times by his father. As the officers made initial contact, Daniel yelled, "No habla ingles!

---

[1] Two witnesses, Officers Romero and Fjetland, testified at the evidentiary hearing. Where no citation to the record is given, the facts are derived from the officers' testimony.

-2-

Get out! No trespassing allowed!" (Doc. 30.) The officers announced themselves as Billings police, and Daniel replied, "Fuck the police, man! Come back with a warrant, motherfuckers!" (*Id.*)

An officer can be heard talking to Sam, calmly asking, "How are you doing? We're just here to talk with him." (*Id.*) Daniel continued to scream in the background, claiming that the officers are trespassing—a recurring theme during the confrontation. (*Id.*) On this point, Daniel was partially correct, as the residence was technically outside city limits. The complainant who made the initial call had mentioned a man yelling from inside his house and a silver car parked outside, but the wrong address was given. When police arrived on the scene, they found that the altercation was not happening at the anticipated address—within city limits—but across the street. However, Officer Romero testified that a five-mile buffer zone surrounds the city, where there may not be official jurisdiction but the city policy still has an obligation to the communities within the zone.

About thirty seconds after Daniel and his father initially became aware of the officers' presence, Sam can be heard saying, "Get your foot out of my door." (*Id.*) Sam had attempted to close the door, but Officer Fjetland had placed his boot

next to the doorjamb to keep it from latching. At the hearing, he testified that he may have shoved the door open to place his foot.

As Daniel continued to scream, Sam insisted that the officers get out of the doorway, and Xena attempted to intercede and calm Daniel down. (*Id.*) She did not succeed. A minute or so into the interaction, Sam repeated his belief that the officers were there illegally. He pointed out that the officers "are not pursuing me into my house," to which an officer responded, "You're right; I'm not. We have an obligation to make sure that everything's fine." (*Id.*) In response, Sam asked Xena if everything was fine, and she said, "Yeah." (*Id.*) From the house, Daniel can be heard yelling that someone was "a piece of shit" and yelling, "I see you putting your foot in my fucking dad's door. You don't have no warrant." (*Id.*)

Despite the officers' multiple enjoinders to "calm down" and "pump the brakes," the situation escalated. (*Id.*) As demonstrated by the audio recording, Daniel's voice grew louder and angrier, with his attention jumping from the officers ("Get the fuck out of here!") to Xena ("Fuck you! Fuck you!") and back again. (*Id.*)

Approximately five minutes after officers arrived at the residence, Sam asked Officer Fjetland to remove his foot from the door. (*Id.*) He replied that he wouldn't, adding "Calm down." (*Id.*) Within seconds, while his foot was still in

the door, Officer Fjetland saw Daniel inside carrying an AR-15, loaded with what appeared to be a large capacity magazine. In the audio recording, the officer can be heard yelling, clearly agitated for the first time during the encounter, "Put the fucking gun down now!" (*Id.*) Within the next minute, the officers were able to get Sam out of the house and onto the ground. Daniel refused to drop the gun, and the officers allowed the door to close.

Xena (and the children in the car) had not yet left the yard at this point. Even after Officer Fjetland saw the gun and left the threshold of the residence, Daniel continued to scream at Xena. She can be heard on the audio recording, saying, "He won't let me leave!" (*Id.*) Shortly after, though, the officers were able to get Xena out of immediate harm.

When Xena and the children were safe, the officers took cover and attempted to negotiate with Daniel, as additional law enforcement resources— including Yellowstone County Sheriff's deputies—arrived on the scene. They did not attempt to reenter the home, even as Sam got up off the porch and repeatedly walked in and out of the residence. Ultimately, after the officers were satisfied that only Daniel and Sam remained in the residence, the officers left the scene because they feared that they would be unable to effectuate an arrest without threatening officer safety. They later applied for and received a search warrant for the

residence, where they found firearms, ammunition, suspected marijuana, and paraphernalia. (Doc. 28-2.)

## LEGAL STANDARD

"As a general rule, to satisfy the Fourth Amendment a search of a home must be supported by probable cause, *and* there must be a warrant authorizing the search." *United States v. Brooks*, 367 F.3d 1128, 1133 (9th Cir. 2004). Daniel does not challenge the responding officers' probable cause determination, focusing only on whether the lack of a warrant can be excused.

Warrantless searches "are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *Katz v. United States*, 389 U.S. 347, 357 (1967). Accordingly, "the government bears the burden of showing that a warrantless search . . . falls within an exception to the Fourth Amendment's warrant requirement." *United States v. Cervantes*, 703 F.3d 1135, 1141 (9th Cir. 2012). The government must meet its burden by a preponderance of the evidence. *United States v. Matlock*, 415 U.S. 164, 178 n.14 (1974).

## DISCUSSION

Daniel alleges that an unconstitutional search occurred when Officer Fjetland put his foot in the door to keep it from closing and that the evidence

resulting from that search must be suppressed. An individual's attempt to close the door to his private residence "constitute[s] a termination of [a] consensual encounter, and communicate[s] his lack of consent to any further intrusion by the officers." *Bonivert v. City of Clarkson*, 883 F.3d 865, 875 (9th Cir. 2018) (quoting *Cummings v. City of Akron*, 418 F.3d 676, 685 (6th Cir. 2005) (emphasis removed)). Thus, when Sam attempted to close the door, Officer Fjetland could not prop it open without either a warrant or an exception to the warrant requirement. There is no question that the responding officers did not have a warrant.

"There are two general exceptions to the warrant requirement for home searches: exigency or emergency." *United States v. Martinez*, 406 F.3d 1160, 1164 (9th Cir. 2005). The government argues that both exceptions are in play here. The Court disagrees as to exigency but finds that the emergency exception applies and that the search therefore did not violate Daniel's constitutional rights.

### I. Exigency

Exigency justifies a warrantless search "if there is probable cause to believe that contraband or evidence of a crime will be found at the premises and that exigent circumstances exist." *Id.* Exigent circumstances are those "that would cause a reasonable person to believe that entry . . . was necessary to prevent

physical harm to the officers or other persons . . . or some . . . consequence improperly frustrating legitimate law enforcement efforts." *United States v. McConney*, 728 F.2d 1195, 1199 (9th Cir. 1984) (en banc).

Exigency justifies a warrantless search only where there is likely to be evidence of crime inside a home. Here, Xena was out of the house—though not necessarily out of harm's way—when Officer Fjetland placed his foot inside the threshold of the doorway. "When the domestic violence victim is still in the home, circumstances may justify an entry pursuant to the exigency doctrine[,]" but exigency cannot be found if "the victim ha[s] left the premises and the officer [does] not have probable cause to believe there was contraband or evidence of a crime in the house." *Martinez*, 406 F.3d at 1164 (citing *United States v. Brooks*, 367 F.3d 1128, 1135 (9th Cir. 2004)).

The government argues at length that exigent circumstances existed, and the Court agrees, but the existence of exigent circumstances does not justify a warrantless search absent probable cause that evidence or contraband will be found in the residence. The government has not even suggested what such evidence or contraband might be. Thus, it has not met its burden of showing exigency, and the warrantless search cannot be excused on this basis.

## II. Emergency

Even where exigency cannot be found, a warrantless search may be justified by the emergency exception. "The emergency doctrine provides that if a police officer, while investigating within the scope necessary to respond to an emergency, discovers evidence of illegal activity, that evidence is admissible even if there was not probable cause to believe that such evidence would have been found." *United States v. Cervantes*, 219 F.3d 882, 888 (9th Cir. 2000). The exception requires satisfaction of three elements:

(1) The police must have reasonable grounds to believe that there is an emergency at hand and an immediate need for their assistance for the protection of life or property.

(2) The search must not be primarily motivated by intent to arrest and seize evidence.

(3) There must be some reasonable basis, approximating probable cause, to associate the emergency with the area or place to be searched.

*Martinez*, 406 F.3d at 1164 (quoting *Cervantes*, 219 F.3d at 888).

"The volatility of situations involving domestic violence make them particularly well-suited for an application of the emergency doctrine. When officers respond to a domestic abuse call, they understand that 'violence may be lurking and explode with little warning.'" *Id.* (quoting *Fletcher v. Clinton*, 196

F.3d 41, 50 (1st Cir. 1999)). And that violence may well be directed at responding officers in addition to partners and family members. *Id.* Thus, the law "recognize[s] the need for law enforcement officers to enter a home without a warrant when it appears that the occupant may injure himself or others." *Id.*

In *Martinez*, the Ninth Circuit found all three requirements to the emergency exception on the basis of facts strikingly similar to those present here:

> [T]he officer responded to an interrupted 911 call concerning domestic violence at a residence known to the officer as the source of prior episodes of domestic violence. On arrival, he observed a crying woman in the front yard and heard continued angry yelling from the interior of the house. He reasonably believed there was an emergency at hand and an immediate need for his assistance for the protection of life or property. He entered the house and proceeded to the bedroom where the defendant was located. In moving the defendant out of the bedroom, the officer saw the firearms. His observation was not motivated by an intent to arrest and seize evidence, but rather was incidental to the officer's management of the situation. The living room where the weapons were discovered was the part of the premises in which the emergency situation had arisen and was logically used by the officer as a place to defuse the situation. As such, there was a sufficient nexus between it and the emergency for the doctrine to apply.

*Id.* at 1165. Indeed, the most notable distinction between the facts of this case and those of *Martinez* is that the search of Daniel's residence was more restrained, extending only to the area visible from the propped-open door.

Here, the three elements of the emergency exception are met. First, at the time of arrival, Xena was still inside the residence, and she (and her children) were

not out of harm's way until after the search was complete. Under the circumstances, the officers "ha[d] reasonable grounds to believe that there [was] an emergency at hand and an immediate need for the assistance for the protection of life." *Id.* at 1164. Second, the search was motivated by concern for the safety of Xena, her children, and the responding officers, not by a drive to collect evidence against Daniel. *Id.* And third, the threshold of the home, where the search occurred, was sufficiently connected to the emergency to justify the search; if Daniel were to attack Xena or the officers, it is likely that the attack would come from the doorway—or, as Officer Romero referred to it during the suppression hearing, the "fatal funnel." *Id.*

The Court takes no view as to whether further intrusion into Daniel's home would have been similarly justified. However, it notes that the officers displayed restraint and reasonable decisionmaking by prioritizing the safety of Xena and her children first and the officers themselves second, particularly since Daniel's behavior never deescalated during the entire encounter. Officer Romero testified that he and the other officers on the scene decided to terminate the encounter without arresting Daniel because further confrontation would jeopardize officer safety, which was unnecessary once Xena and the children were out of harm's

way.[2] Had the officers failed to terminate the encounter, serious injury or death may well have resulted.

Because the emergency exception to the warrant requirement applies, the search was not "unreasonable" under the Fourth Amendment.

Accordingly, IT IS ORDERED that the motion (Doc. 23) is DENIED.

DATED this 5th day of November, 2019.

Dana L. Christensen, Chief Judge
United States District Court

---

[2] It should also be noted that it was not until late in the encounter, after other officers arrived on the scene and further conversation with Xena occurred, that the officers were satisfied no other persons remained in the residence other than Daniel and Sam.